IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

HEMPSTEAD COUNTY HUNTING CLUB                         PLAINTIFF

VS.                               CASE NO. 08-CV-4038

SOUTHWESTERN ELECTRIC POWER
COMPANY                                                DEFENDANT

**<u>ORDER</u>**

On May 9, 2008, Hempstead County Hunting Club ("HCHC") filed a citizen's suit against Southwestern Electric Power Company ("SWEPCO") pursuant to the Federal Clean Air Act, 42 U.S.C. §§7401-7671, et seq. In its Complaint, HCHC has sought preliminary and permanent injunctions to prevent SWEPCO from commencing construction, constructing or continuing construction of its 600-megawatt pulverized coal-fired power plant in Hempstead County, Arkansas, without first obtaining a Prevention of Significant Deterioration ("PSD") permit as required by the Clean Air Act ("CAA"). It has also sought declaratory relief concerning SWEPCO's violations of the Act, along with civil penalties for those violations. On the same day, HCHC filed a Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. No. 4). On June 4-6, 2008, the Court conducted a hearing in regard to HCHC's Motion for Preliminary Injunction. Based upon the testimony heard at the hearing, along with the pleadings filed in the case, the Court now enters its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**FINDINGS OF FACT**

*Factual Background*

Plaintiff HCHC is an Arkansas corporation with its principal place of business in Texarkana, Arkansas. It is a non-profit corporation organized under 26 U.S.C. §501(c)(7). HCHC has 50 shares of stock outstanding and more than 30 active members. HCHC was incorporated around 1904 for recreational purposes and to preserve the club's over 4,000 acres of real property in Hempstead County, Arkansas. Included on the club's property is a 2,315 acre marshy body of water know as Grassy Lake which forms the floor of an ancient Bald Cypress forest. Grassy Lake is home to a wide variety of wildlife including alligators and approximately 128 species of birds. The members' recreational activities at HCHC include duck, deer and turkey hunting, bird watching, alligator spotting, fishing, and various other activities that involve local and migratory wildlife.

Defendant SWEPCO is a corporation organized and existing under the laws of the State of Delaware. SWEPCO is a wholly owned subsidiary of American Electric Power Company, Inc. ("AEP"). SWEPCO is authorized to do business in the states of Arkansas, Texas, Louisiana and Oklahoma. In Arkansas, SWEPCO engages in the general electric utility business of generating, transmitting, distribution and selling electric power and energy to customers in its service area. It is a public utility within the meaning of Ark. Code Ann. § 23-1-101. As such, SWEPCO is subject to the jurisdiction of the Arkansas Public Service Commission ("APSC").

On December 8, 2006, SWEPCO filed with the APSC an Application for a Certificate of Environmental Compatibility and Public Need ("CECPN") to construct a 600-megawatt pulverized coal-fired power plant ("Turk Plant") in Hempstead County, Arkansas. In January

2007, HCHC was allowed to intervene in the proceeding before the APSC, along with others owning property adjacent to or in the general proximity of SWEPCO's proposed plant site. On November 21, 2007, after receiving public and agency comments and conducting a public hearing on the application, the APSC granted SWEPCO a CECPN in connection with the Turk Plant.[1] HCHC has appealed the APSC's decision to grant the CECPN to the Arkansas Court of Appeals.

The CECPN issued to SWEPCO is subject to various conditions. Included in these conditions was SWEPCO obtaining and complying with all necessary permits required by the United State Environmental Protection Agency ("EPA") and the Arkansas Department of Environmental Quality ("ADEQ"). SWEPCO is in the process of obtaining a Prevention of Significant Deterioration ("PSD") permit as required by the CAA, 42 U.S.C. § 7475(a), and EPA and ADEQ regulations. On June 12, 2007, ADEQ issued a draft PSD permit for the Turk Plant. HCHC has submitted written comments to ADEQ and participated in a public hearing in regard to the draft permit. A final PSD permit has not been issued by ADEQ.

In May 2007, SWEPCO began site preparation work at the proposed site of the Turk Plant. This work has included the following: site clearing; grading and site leveling; installing a detention pond for surface water runoff control; installing construction trailers, office trailers, break trailers, and porta-potties; installing parking lots, storage and laydown areas for construction equipment and construction materials; installing utilities (telephone lines, computer lines, electrical, sanitary and potable water) to construction facilities; ordering, mobilizing and

---

[1] SWEPCO's CECPN was issued by the APSC on a 2 to 1 vote, with Special Commissioner, David Newbern, dissenting.

storing construction equipment on site; ordering, mobilizing and storing construction materials on site; installing access roads to and on site; and installing temporary security fencing on site.

On May 9, 2008, HCHC filed this citizen's suit against SWEPCO pursuant to 42 U.S.C. § 7604(a)(3). In its Complaint, HCHC alleges that SWEPCO has begun actual construction of the proposed Turk Plant without first obtaining a valid PSD permit as required by the CAA. HCHC asks that SWEPCO be enjoined from further construction on the proposed plant site until such time as a PSD permit has been obtained from ADEQ. In response, SWEPCO states that it has not begun actual construction of the Turk Plant. Rather, it contends that it is engaging in site preparatory work which is allowed by EPA and ADEQ regulations, along with the EPA's guidance memorandums interpreting the PSD requirements.

*Statutory and Regulatory Background*

The objective of the CAA is " to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b). To help accomplish this objective, the CAA requires a proposed major emitting facility to obtain a Prevention of Significant Deterioration permit prior to construction. 42 U.S.C. § 7475(a). States are authorized, pursuant to their federally approved State Implementation Plans ("SIPs"), to develop and enforce equivalent preconstruction permit requirements which apply to any new major emitting facility. Arkansas' SIP, which includes the PSD program requirements, has been approved by the EPA. The states' PSD program has adopted by reference the EPA's PSD regulations with limited exceptions. *See* Pollution Control & Ecology Commission Reg. 19.903(B) and 19.904(A). Therefore, the Court looks to federal law in interpreting Arkansas' PSD requirements.

The CAA does not expressly define the word "construction." Therefore, the courts must look to EPA regulations and guidance memorandums to give the term meaning and to determine what type of activities may be conducted prior to the issuance of a PSD permit.

The EPA's regulations implementing 42 U.S.C. § 7475(a) provide that "no new major stationary source ... shall begin actual construction without a [PSD] permit ...." 40 C.F.R. § 52.21(a)(2)(iii). "Begin actual construction" is defined as the "initiation of physical on-site construction activities on an emissions unit which are of a permanent nature. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures ...." 40 C.F.R. § 52.21(b)(11). Therefore, in order for an activity to be considered "actual construction" and, thus, prohibited without a PSD permit, it must 1) be physical; 2) occur on-site; 3) be on an emissions unit; and 4) be permanent in nature.

Over the years, the EPA has issued various guidance memorandums interpreting the above definitions and setting forth the types of activities that may be conducted without violating the regulation's prohibition against beginning "actual construction" without a PSD permit. The first in this series of memorandums interpreted the word "constructed" as it applies to activities undertaken prior to issuance of a PSD permit. In this document, the EPA stated that certain limited activities would be allowed in all cases. These activities were planning, ordering of equipment and materials, site-clearing, grading, and on-site storage of equipment and materials. It also reiterated the regulation's prohibition against activities of a permanent nature by stating that "[a]ll on-site activities of a permanent nature aimed at completing a PSD source for which a permit has yet to be obtained are prohibited under all circumstances." For example, installation

5

of building supports and foundations, paving, laying underground pipe work, and construction of permanent storage structures were listed as prohibited activities.  *See* Memorandum from Edward E. Reich, Director of the Station Source Enforcement Division, to Enforcement Division Directors Regions I-X,  et al., Interpretation of "Constructed" as it Applies to Activities Undertaken Prior to Issuance of a PSD Permit (Dec. 18, 1978).  The policy set forth in this memorandum defines the type of activities allowed at a PSD-affected source site prior to the issuance of the PSD permit.  The Agency recognizes that this policy has the undeniable disadvantage of allowing a good deal of activity at the proposed site, which may be highly susceptible to environment impact.  However, it reasons that the advantages of the policy outweigh the disadvantages.[2]  *Id.*

     The  EPA's March 28, 1986, memorandum clarifies that the prohibition applies to an "emissions unit" which includes any installation necessary to accommodate that unit.  If the construction activity is an integral part of the PSD source, the source must obtain a PSD permit.  *See* Memorandum from Edward E. Reich, Director of the Station Source Compliance Division, to Robert DeSpain, Chief of the Air Programs Branch, Region VIII, Construction Activities Prior to Issuance of a PSD Permit with Respect to "Begin Actual Construction" (March 28, 1986).

     The EPA's memorandum dated May 13, 1993, clarifies that the Agency's policy also

---

[2] This memorandum actually predates 40 C.F.R 52.21(b)(11) and its definition of "begin actual  construction."  The "begin actual construction" definition is based upon the EPA's 1978 memorandum and is intended to embody in regulatory form the Agency's policy that site preparation activities do not trigger PSD requirements.  *See* 46 FR 37778 (July 22, 1981)(Letter from Valdas V. Adamkus, Acting Regional Administrator, Region V, to Joseph M. Polito, Esquire, regarding the City of Detroit/General Motors Corporation's Central Industrial Park Project).

focuses on the relation of the activity to the PSD source. It states that site clearing and grading are generally not considered permanent activities related to the specific project. However, in the case before it, the blasting, excavation and construction of a retaining wall were permanent and an integral part of the PSD source. Therefore, the activities in this instance were prohibited prior to obtaining a PSD permit. *See* Memorandum from John B. Resnic, Director of the Stationary Source Compliance Division, to Bernard E. Turlinski Chief of the Air Enforcement Branch, Region III, Construction Activities at Georgia Pacific (May 13, 1993).

The EPA's November 4, 1993, memorandum reiterates the EPA's interpretation concerning the range of construction related activities that lawfully may occur prior to the issuance of a PSD permit. It states that those activities that do not represent an irrevocable commitment to the project, such as planning, ordering of equipment and materials, site clearing, grading, and on-site temporary storage of equipment and materials are allowed. In contrast, all on-site activities of a permanent nature aimed at completing construction of the source are prohibited. Prohibited activities include, but are not limited to, installation of building supports and foundations, paving, laying underground pipe work, and construction of any permanent storage structure. *See* Memorandum from Dave Howekamp, Director of the Air and Toxics Division, to All Region IX Air Agency Directors and New Source Review Contacts, Preconstruction Review and Cons (November 4, 1993).

The EPA's memorandum dated December 13, 1995, again states that preconstruction activities that are permanent in nature and an integral part of the PSD source are prohibited prior to receiving a PSD permit. It states that such prohibited activities are those which are costly, significantly alter the site, and/or are permanent in nature. Examples of these activities include

7

1) excavating, blasting, removing rock and soil, and backfilling, and 2) installing footings, foundations, permanent storage structures, pipe and retaining walls. *See* Memorandum from John S. Seitz, Director of the Office of Air Quality Planning and Standards, to Charles W. Williams, Commissioner, Minnesota Pollution Control Agency (December 13, 1995).

## **CONCLUSIONS OF LAW**

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of a preliminary injunction. When a court is considering the issuance of an injunction it must consider the following factors: 1) the probability of the movant's success on the merits; 2) the threat of irreparable harm to the movant; 3) the balance between the harm and the injury that granting the injunction will inflict on the respondent; and 4) whether the issuance of an injunction is in the public interest. *Tempur-Pedic Int'l., Inc. v. Waste to Charity, Inc.,* 483 F.Supp.2d 766, 772-73 (W.D. Ark. 2007)(citing *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1991) (*en banc*)). HCHC must demonstrate each of the above factors in order to obtain a preliminary injunction in this case. No single factor is determinative. Rather, each factor must be considered to determine whether the balance of equities weights toward granting the injunction. *Id.* at 773. (citing *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Ferzer Co.,* 997 F.2d 484, 485-86 (8th Cir. 1993)).

### *Likelihood of Success on the Merits*

The first factor, i.e., likelihood of success on the merits, requires HCHC to demonstrate that it has a "fair chance of prevailing" after a trial on the merits. *See Heartland Acad. Cmty. Church v. Waddle,* 335 F.3d 684, 690 (8th Cir. 2003). In support of this factor, HCHC contends that SWEPCO has illegally begun "actual construction" within the meaning of the CAA and its

regulations. In support of this contention, HCHC first points to the term "commenced" as it applies to construction of a major emitting facility. See 42 U.S.C. § 7479(2)(A); Memorandum from Roger Strelow, Assistant Administrator for Air and Waste Management (AW-433) to Regional Administrators, PSD Regulations–Interpretation of "Commencement of Construction" (December 18, 1975). Although HCHC admits that this definition only applies to the historical development of the PSD program, it argues that the definition provides insight into Congress's understanding of what constitutes construction. HCHC then points to 40 C.F.R. § 52.21(b)(11)'s definition of "begin actual construction" and its ensuing guidance memorandums. HCHC argues that SWEPCO has begun actual construction without first obtaining a PSD permit because it's activities at the Turk Plant site are costly, significantly alter the site and are permanent in nature.

In response, SWEPCO contends that its activities at the Turk Plant site are not prohibited as they are not physical, on-site construction activities on an emissions unit which are of a permanent nature. In support of this contention, SWEPCO points to 1) ADEQ's May 10, 2007, letter to SWEPCO listing various allowable activities at the site, and 2) the affidavit and testimony of John S. Seitz, former Director of the Office of Air Quality Planning and Standards for the EPA.

EPA and ADEQ regulations prohibit actual construction of a major emitting facility, like the Turk Plant, without a PSD permit. However, not all activities on a proposed plant site are prohibited. To be considered "actual construction" and, thus, prohibited, an activity must be physical, on-site construction activity on an emissions unit which is permanent in nature. In other words, the question before the Court is whether SWEPCO's on-site activities are of a permanent nature aimed at completing the PSD source. SWEPCO's activities, thus far, include

site clearing, site grading, ordering of equipment and construction materials, installing storage and laydown areas for storage of equipment and construction materials, storing the equipment and materials on site, installing construction and office trailers, installing break trailers, creating access roads in and on site, and creating a detention pond to control surface water runoff from the construction site. These on-site activities are not of a permanent nature aimed at completing the PSD source. Thus, they are permissible prior to receiving a PSD permit. HCHC claims that these activities are both costly and they significantly alter the site; therefore, the acts are prohibited. However, for the acts to be prohibited, they must also be permanent and an integral part of the PSD source. They are not. SWEPCO has not installed any building supports or foundations, constructed any retaining walls, done any paving, laid any underground pipe work, or constructed any permanent storage structures. SWEPCO has not began "actual construction" within the meaning of the CAA and its regulations. Thus, the Court believes that it is unlikely that HCHC will prevail on the merits of its case.

*Irreparable Harm to HCHC*

The second factor requires HCHC to demonstrate that there is a threat of irreparable harm to it if an injunction is not issued in this case. In support of this factor, HCHC contends that it will be irreparably harmed if SWEPCO is allowed to disregard its obligation to construct the Turk Plant in accordance with the CAA permit requirements.

The Court has determined that SWEPCO has not begun "actual construction" within the meaning of the CAA. Therefore, the preconstruction activity taking place at the Turk Plant site is allowable prior to the issuance of a PSD permit. There is no evidence that SWEPCO's permissible pre-permit activity at the site has or will result in any cognizable harm to HCHC.

HCHC also claims harm to its "procedural rights." However, their rights are being fully exercised in the ongoing permitting process before the ADEQ. Thus, the Court does not believe that HCHC will be irreparably harmed as a result of the denial on an injunction in this case.

### *Balance of Hardships*

The third factor requires the Court to balance the harm to HCHC if an injunction is not granted and the injury that granting an injunction will have on SWEPCO. In support of this factor, HCHC claims that it will lose its right to participate in and see carried out the CAA permitting process if an injunction is not granted. In comparison, it claims that SWEPCO will not be harmed by an injunction because it has no right to engage in its illegal, unauthorized construction activities at the Turk Plant site.

The Court has determined that SWEPCO's preconstruction activities at the proposed Turk Plant site are lawful under the CAA, its regulations, and ensuing guidance memorandums. Therefore, granting an injunction in this case would interfere with SWEPCO's ability to pursue this lawful activity and would ultimately cost SWEPCO both time and money. HCHC, on the other hand, is currently exercising its rights in the ongoing PSD permitting process before the ADEQ. After balancing these hardships, the Court believes that the injury to SWEPCO if the injunction is granted far outweighs any potential harm to HCHC if it is not.

### *Public Interest*

The fourth factor requires HCHC to show that the issuance of an injunction in this case is in the public interest. In support of this factor, HCHC claims that injunction relief would benefit the public interest because SWEPCO will be enjoined from its continued violation of CAA mandates that were enacted expressly to protect the public interest. The Court has determined

11

that SWEPCO's activities at the proposed site are lawful under the CAA, and the APSC has determined that the construction of the Turk Plant will serve the public interest. In light of these determinations, the Court believes that it would not be in the public interest to enjoin SWEPCO from going forward with the lawful activity at the Turk Plant site.

## CONCLUSION

In light of the above findings of fact and conclusions of law, the Court finds that a preliminary injunction shall not be issued in this matter. Therefore, Plaintiff Hempstead County Hunting Club's Motion for Temporary Restraining Order and Preliminary Injunction should be and hereby is **denied.**

IT IS SO ORDERED, this 10th day of July, 2008.

    /s/Harry F. Barnes
Hon. Harry F. Barnes
United States District Judge